POLK COUNTY NAT. BANK v. FOOTE COMMERCIAL PHOSPHATE CO.

(Circuit Court of Appeals, Fifth Circuit. June 4, 1894.)

No. 366.

LEASE—CONDITIONS.

One T. leased certain lands to F. for 20 years by an instrument which provided that the lessee should construct on the premises a phosphate-mining plant with a daily capacity of not less than 100 tons, within five months from the execution of the lease, with the right, under certain circumstances, to extend this time to eight months. It was also provided that the lessee should pay the lessor a royalty of 50 cents per ton on phosphate mined, and that, immediately on completion of the plant, a monthly payment of $125 should begin, which should be made to protect the lessor from stoppages for certain causes, and should be credited on royalty account. F. assigned the lease immediately, and the assignee took possession and erected a phosphate-mining plant, but of less than 100 tons daily capacity, though how much less did not appear. *Held,* that the provision in the lease as to erection of the plant was not a forfeiture bearing condition, such as to authorize the grantees of the lessor to oust the tenant as one holding after the expiration of his right. Per McCormick, Circuit Judge, and Bruce, District Judge. Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of Florida.

This was a proceeding under Rev. St. Fla. § 1690, by the Polk County National Bank against the Foote Commercial Phosphate Company to eject the defendant from certain lands. Judgment was rendered in the circuit court for the defendant. Plaintiff brings error. Affirmed.

H. Bisbee and C. D. Rinehart, for plaintiff in error.

Frank Clark, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and BRUCE, District Judge.

McCORMICK, Circuit Judge. This proceeding was begun May 5, 1894, under section 1690 of the Revised Statutes of Florida, which provides that if any person shall enter or shall have entered in a peaceable manner into any lands or tenements, in case such entry is lawful, and after the expiration of his right shall continue to hold the same against the right of the party entitled to the possession, the party so entitled, whether as tenant of the freehold, tenant for years, or otherwise, shall be entitled to the like summary remedy at any time within three years after the possession shall so have been withheld from him against his consent. The declaration follows the statutory form. The answer is: First, that the said plaintiff is not entitled to the possession of the real estate described in said complaint; second, that this defendant holds possession of said property under a valid lease for a term of years, which said lease was at the time of the filing of said complaint, and still is, in force and effect; third, that the holding of possession of said property by the defendant is legal, and under claim of legal right. The lease relied on in the foregoing answer is as follows: "This indenture, made and entered into on this the 26th day of November, A. D.

1892, by and between Judson H. Tatum, a bachelor, of the county of Polk and state of Florida, party of the first part, and hereinafter called the lessor, which expression shall include his heirs and assigns where the context so requires or admits, and Richard R. Foote, also of said county and state, party of the second part, hereinafter called the lessee, which expression shall include his executors, administrators and assigns, where the context so requires or admits, witnesseth: Whereas the said lessor is the owner in fee simple of certain phosphate lands situate, lying, and being in the county of Polk and state of Florida, and more particularly described as follows, to-wit: The southeast quarter of the northwest quarter; the east half of the southwest quarter; the northeast quarter of the northwest quarter; the west half of the southeast quarter, less ten (10) acres in the southeast corner of the southwest quarter of the southeast quarter, and beginning at the southeast corner of the southeast quarter of the northwest quarter, and running thence east four and ninety-hundredths ($4^{90}/_{100}$) chains, thence north twenty (20) chains, thence west four and ninety-hundredths ($4^{90}/_{100}$) chains, and thence south twenty (20) chains to the place of beginning,—all of said described land being in section twenty-two (22), and township thirty (30), south of range twenty-five (25) east, and containing in the aggregate two hundred and forty (240) acres, more or less. And whereas the said lessor is desirous of leasing said described lands to the said lessee and his assigns for a term of twenty (20) years, for the purpose of mining, preparing for market, and shipping phosphates and other minerals therefrom, on the terms and conditions hereinafter set forth and agreed upon. Now, therefore, in consideration of the sum of one dollar in hand paid to the lessor by the lessee, the receipt of which is hereby acknowledged, and of other valuable considerations hereinafter mentioned to be done and performed, the said lessor doth hereby lease and demise unto the said lessee, his executors, administrators, and assigns, the aforesaid described property for a term of twenty (20) years from the date hereof, on the terms and conditions hereinafter set forth. First. The said lessee or his assigns shall, within five (5) months from the date hereof, have erected and completed on the said described property a modern phosphate mining and drying plant, with a daily capacity of not less than one hundred (100) tons. That on the completion of said plant the said lessee, or his assigns or representatives, shall immediately commence the operation of mining said phosphate, and continue the same so long as the said phosphate can be found on the said property in quantity and quality to suit the market during the term of this lease; and that work shall be commenced on such plant within sixty (60) days from the date of this instrument. Be it understood, however, that if, from providential or other causes not arising from the negligence of the said lessee, such plant shall not be fully completed and in operation within said five months' time from the date hereof, and he or his assigns are in good faith endeavoring to complete the same, then, and in that event, the said lessee and his assigns are to have three (3) months' additional time in which to complete said plant in accord-

ance with the above description of the same. Second. That for each and every long ton of two thousand two hundred and forty (2,240) pounds of phosphate mined, cleaned, dried, and prepared for market from the said property, a royalty of fifty cents per ton shall be allowed and paid to the lessor as owner of said lands, on account of and in compensation of said lease. The said payments to be made every two months, commencing two months after the plant has been put in operation, as aforesaid, and continuing every two months thereafter until the expiration of said lease, or until no more phosphates can be found on said property in paying quantities and qualities to suit the market. Third. For the purpose of facilitating a just and equitable settlement between the parties hereto, the lessee shall always, on request, furnish to the lessor duplicate bills of lading from the railroad company, or from any other mode of transportation, as well as duplicate accounts of sale, showing what phosphate has been mined and shipped from the said property during the two months to be then settled for, which bills of lading and accounts of sales shall be accepted and conclusive as a basis of settlement between the parties hereto. It is, however, understood and agreed that said lessee is to pay, as aforesaid, at the end of each period of two months the sum of fifty cents per ton royalty for each and every ton shipped to market during said period of two months; and for each and every ton mined and housed by said lessee during any two months, and for any reason not marketed during that time, he is to pay to the lessor thereon the sum of twenty-five cents per ton, and shall not be required to pay the remaining twenty-five cents per ton until such time as that said phosphate so mined and stored shall be duly marketed. Fourth. Immediately upon completion of said plant, a monthly payment of one hundred and twenty-five ($125.00) dollars shall be made at the expiration of every month by the lessee to the lessor, and continued during the existence of this lease, and shall be credited on royalty account. It is agreed that this monthly payment shall be made to protect the lessor against stoppage of works, occasioned by a depressed market for phosphates, or breakage of machinery, or any other reasonable cause, and be made as part compensation of said lease, and to be credited on royalty account, as above stated. Fifth. It is hereby agreed that said lessee and his assigns and representatives may at all times during the term of said lease have the sole and exclusive right to mine and develop the phosphates and other minerals on said lands, together with the right of ingress and egress into and over said lands, without any hindrance whatever, with the right to build tram or railways or macadamized or other roads in, upon, and through said lands, and to erect all necessary buildings and machinery for the purpose of mining, preparing, and manufacturing said phosphates or fertilizers, and to do and perform all and singular such other acts and things as may be necessary or useful in properly carrying on and conducting thereon the business of phosphate mining. And it is further understood and agreed that said lessee and his assigns shall have the right to use, free of cost, such timber and wood and other build-

ing materials found on the property as may be required for construct-ing the plant or any of its works, roadways, bridges, buildings, etc., and to maintain or repair the same, or in building any addition thereto; and shall also have the right, free of cost, as aforesaid, to use such wood and timber for fuel in carrying on the business of mining, cleaning, drying, storing, and shipping said phosphates, and also for building side tracks, switches, tramways, in connection with or for the use of said business, and for any other purpose connected with or for the benefit of said mining operations.   Sixth. The ma-chinery, tools, buildings, and appurtenances thereto, shall remain on the said described property until the provisions of this lease are com-plied with.   Seventh. It is also agreed and understood that the les-sor hereby binds himself and agrees to sell to the said lessee or his assigns the said described real estate at any time within twenty-three (23) months from the date hereof at the price of two hundred ($200.00) dollars per acre, and to make, execute, and deliver to the said lessee, upon the payment of said sum per acre, a good and sufficient war-ranty deed of conveyance in and to the said property; and in the event that said lessee or his assigns should desire to purchase the said property with eleven (11) months from the date hereof, at the price named, then the lessor agrees that all sums theretofore paid as royalty shall be considered and credited as a part of the pur-chase money of said described lands.   Eighth. It is mutually under-stood and agreed that this lease, with all its rights, privileges, and obligations, may be sold, assigned, and transferred to any individual, syndicate, or corporation, for the purpose of carrying into effect the objects herein enumerated."   Three days after the making of the above lease it was assigned to the defendant in error.   Seven months after granting the lease the lessor sold the 240 acres of land covered by the lease to one Warren Tyler, and conveyed the same to him by deed for a recited consideration of $36,000 cash to him in hand paid. In this deed no express reference is made to the lease in question, but on the same day (June 30, 1893), by a separate instrument at-tested by different witnesses, the lessor, Tatum, assigned and trans-ferred to Warren Tyler all of Tatum's interest in the lease contract. This transfer recites that five other named parties have specified in-terests in the lease contract which Tatum does not assign.   More than six months after these last-named transfers, on January 15, 1894, Tyler transferred by quitclaim deed all of his interest in the 240 acres to the Polk County National Bank, the plaintiff in error. On the trial, the plaintiff having put in evidence the lease and the conveyances of the land and the written instrument assigning the les-sor's interest in the lease contract above referred to, introduced in evidence testimony tending to show that the defendant took posses-sion of the lands and premises described in the first contract men-tioned in the said first bill of exceptions (the lease), and tending to establish that it erected a phosphate mining and drying plant on the said property; and the plaintiff also offered in evidence testi-mony tending to establish that the phosphate mining and drying plant erected on the said land did not have a daily capacity of 100

tons. The trial judge directed a verdict for the defendant. Five errors are assigned, but the counsel for the plaintiff, in the outset of his argument, says that the only point in this case in controversy is the construction of the language of the lease. The contention of the plaintiff is that it is such a conveyance or contract on condition that the failure to fully perform the condition within eight months from the date of the contract, or certainly within a reasonable time from that date, worked a forfeiture of the contract, and the lessor or his assigns can maintain this statutory proceeding against the lessee in possession. It is clear that this contention would carry us beyond the express words of the instrument of lease. This is not a case where there has been no performance or attempt to perform. The record shows that the lessee did enter upon the premises and erect a phosphate mining and drying plant before the institution of these proceedings. It does not show exactly when this plant was erected, but against plaintiff's contention it is fair and safe to assume that this was done within the eight months allowed by the instrument. The proof tended to show that the plant erected did not have "a daily capacity of not less than 100 tons"; but, for all that appears, and for all that plaintiff's contention seems to care, it may have a daily capacity of 99 tons. The lessee was not bound to make a daily output of 100 tons. He was not bound under all conditions to make any daily output, but, for named causes or other good cause, might stop operation altogether, and be liable during such time for $125 a month as advance payment on royalties to begin from the completion of the plant. It is urged in argument that this would never begin if the plant was never completed. The fallacy of this suggestion is manifest. The controversy here is whether the provision is a forfeiture bearing condition or is a covenant, and not whether the lessee was bound at all, but whether he was bound under the penalty the plaintiff seeks to inflict. Even if the construction contended for by the plaintiff was tenable, considering only the terms of the instrument, a court of law would find, in the subsequent dealings of the lessor and of his assigns, sufficient ground to hold that the letter of the bond had been waived. The judgment of the circuit court is affirmed.

PARDEE, Circuit Judge, dissenting.